IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Franklin Park Lincoln-Mercury, Inc., | Case No. 3:09 CV 792 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Ford Motor Company, | |
| Defendant. | |

### INTRODUCTION

In February 2008, Defendant Ford Motor Company ("Ford") approved and partially financed a transfer in ownership of an existing Toledo, Ohio Lincoln-Mercury automotive dealer franchise. That decision sparked (by current tally) almost six years of litigation between Ford and its other Toledo Lincoln-Mercury dealer, Plaintiff Franklin Park Lincoln-Mercury, Inc. ("Franklin Park"). That lengthy litigation involved proceedings before a state agency, each level of the Ohio state judiciary, extended proceedings in this Court, and Sixth Circuit review of this Court's earlier determination on summary judgment that Ford had a legitimate business justification for approving the franchise transfer, and thus did not engage in predatory conduct prohibited by state law.

The Sixth Circuit affirmed this Court's summary judgment analysis. Ford now argues the factual findings that supported judgment as a matter of law on Franklin Park's predatory conduct claim defeat the remaining claim in this case: Ford's alleged violation of the good faith duty it owes Franklin Park under the Ohio Motor Vehicle Dealer Act ("OMVDA"). Ford moved for summary judgment (Doc. 103). Franklin Park opposed (Doc. 106), and Ford replied (Doc. 109). For the reasons that follow, Ford's Motion is granted.

## BACKGROUND

The parties are familiar with the initial summary-judgment record (*see* Doc. 88 at 9–10; Doc. 98 at 2–4), and with the summary-judgment standard of review (*see* Doc. 88 at 2).

In moving for summary judgment, Ford solely relies on the factual record constructed for purposes of Ford's initial summary judgment motion (Doc. 103 at 8 n.1). Franklin Park supplements the initial summary-judgment record with "Second Affidavits" of Robert Fleisher ("Fleisher"), Franklin Park's President (Doc. 106-5 at ¶ 3), and John Matthews ("Matthews"), Franklin Park's expert witness (Doc. 106-7).

## DISCUSSION

Franklin Park alleges Ford violated the OMVDA's requirement that "in acting . . . under the terms, provisions, or conditions of a franchise," a franchisor not "fail to act in good faith." R.C. § 4517.59(I). For purposes of the Act, "good faith" is defined in the OMVDA as:

> [H]onesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade as is defined in division (S) of section 1301.01 of the Revised Code, including, but not limited to, the duty to act in a fair and equitable manner so as to guarantee freedom from coercion, intimidation, or threats of coercion or intimidation; provided however, that recommendation, endorsement, exposition, persuasion, urging, or argument shall not be considered to constitute a lack of good faith.

R.C. § 4517.01(BB), quoted in *Jim White Agency Co. v. Nissan Motor Corp. in U.S.A.*, 126 F.3d 832, 834 (6th Cir. 1997).

At the time of the bad-faith conduct alleged in this case, Ohio Revised Code § 1301.01(S) defined "good faith" as "honesty in fact in the conduct or transaction concerned." *Jim White Agency Co.*, 126 F.3d at 834. Subsequent amendments to the good-faith definition (adopted in March 2011) "apply to transactions entered into on or after the effective date" of the good-faith amendment. 2011

2

HB 9 at Sec. 3. *See also* R.C. § 1.48 ("A statute is presumed to be prospective in its operation unless expressly made retrospective."); *Earl Evans Chevrolet, Inc. v. Gen. Motors Corp.*, 74 Ohio App. 3d 266, 272 (1991) (construing a statutory provision materially identical to R.C. § 4517.59(D) as not "express[ing] an intent to apply the strictures of [an amended version] of [§] 4517.59 to *conduct* predating the amendment") (emphasis in original). Therefore, Ford's actions must be judged according to the prior good-faith definition; all events that gave rise to the good-faith claim, and all Complaint filings (*see* Docs. 1 & 31), occurred before the current (and re-numbered) version of § 1301(S)'s June 2011 effective date.

Moreover, while "coercion," as used in § 4517.01(BB), is a defined term, its definition does not aid in the analysis of Ford's conduct; the relevant portions of the "coercion" definition refer back to a franchisor's good-faith duty. *See* R.C. § 4517.01(CC) ("'Coerce' means to compel or attempt to compel by failing to act in good faith or by threat of economic harm, breach of contract, or other adverse consequences. Coerce does not mean to argue, urge, recommend, or persuade."). In this case, there is no evidence that Ford threatened or compelled Franklin Park to do anything.

Conduct falls short of the § 1301.01 good-faith definition if it is "'commercially' unjustifiable." *Master Chem. Corp. v. Inkrott*, 55 Ohio St. 3d 23, 28 (1990). The Sixth Circuit has applied the *Inkrott* standard to an OMVDA good-faith claim. *See Jim White Agency Co.*, 126 F.3d at 834. *See also Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 2010 U.S. Dist. LEXIS 21787, at *18–19 (N.D. Ohio 2010) ("[T]his Court finds that [a franchisor's] actions in repurchasing the parts inventory were taken in good faith, and that its actions were commercially justifiable in light of the large debt [the plaintiff-franchisee] owed to it," which likely could not be repaid), *aff'd*, 437 F. App'x. 381 (6th Cir. 2011). And the Sixth Circuit standard is consistent with state court application of the

OMVDA. *See, e.g.*, *Transamerica Servs. Technical Supply, Inc. v. Gen. Motors Corp.*, 2004 WL 234684, at *6 (Ohio. Ct. App. 2004) (concluding there was "no evidence that GM's decision was motivated by anything other than legitimate business concerns" to support a bad-faith claim, when GM withdrew from negotiations to purchase a dealership); *Earl Evans Chevrolet*, 74 Ohio App. 3d at 277 (describing as possible bad-faith conduct franchisor action taken "outside the ordinary course of business" to withhold scarce car models from its dealer). *Cf. Kenwood Lincoln-Mercury, Inc. v. Daimlerchrysler Corp.*, 2003 WL 10073, at *4-5 (Ohio Ct. App. 2003) (finding substantial-evidence support for an Ohio trial court's determination that "provisions placing the burden of proof in an audit on the dealer is not unreasonable or in bad faith nor does it indicate a lack of good faith. The sound business reason for this is that the dealer, not the manufacturer, has the paperwork to justify the requested warranty reimbursement.").

But the parties dispute how the *Inkrott* standard applies to this case. Ford argues that if an action is supported by a business justification, the action is not commercially unjustifiable, and therefore does not violate the OMVDA's good-faith requirement. Franklin Park argues Ford's interpretation "would work an end-run around the OMVDA" (Doc. 106 at 12). Franklin Park claims that, under Ford's theory, a franchisor could "specifically (and perhaps, admittedly) undertake efforts to drive a dealer out of business by any number of means," action that would appear to violate the OMVDA's specific prohibition against predatory conduct. "*Some* benefit would accrue to the manufacturer, even if it is just the savings on postage from not having to mail things to that dealer, and that would be enough to render the conduct permissible. This would be [an] absurd result, but a permissible one, under Ford's theory" (*id.* at 13) (emphasis in original).

4

Ford's interpretation of the OMVDA's good faith requirement logically follows from the *Inkrott* standard. That is, conduct with a commercial or business justification cannot be "commercially unjustifiable." The two formulations -- equating bad faith (or the absence of good faith) with commercial unjustifiabilty, and good faith (or the absence of bad faith) with a commercial justification -- are simply different but equivalent ways of phrasing the same standard. Ford's standard also is consistent with Sixth Circuit case law, applying the former definition of good faith.

Franklin Park's concerns about the consequences that would follow adoption of Ford's reading are overblown. "[I]t is customary to apply the more specific provision [of a statute], the one meant to govern the particular situation involved, rather than the more general rule." *Troyer v. Janis*, 132 Ohio St. 3d 229, 232 (2012). The "general rule" here is the OMVDA's good-faith requirement, while the "specific provision" could be any one of the twenty-five other subsections of § 4517.59, each of which prohibit a franchisor from engaging in specifically-defined conduct. So while it may be the case that a franchisor could point to a commercial justification in support of its efforts to "prevent . . . a[] new motor vehicle dealer from charging any consumer a[] fee allowed to be charged by the dealer under Ohio law" -- customers presumably would be attracted to Ford dealers if Ford prohibited its dealers from charging certain permissible fees -- the OMVDA nonetheless unambiguously proscribes such conduct. *See* R.C. § 4517.59(21). It is not an absurd result to conclude Ohio's generally-applicable good-faith requirement was meant to prevent only bad faith conduct with respect to those franchisor actions not otherwise covered by a specific OMVDA provision.

The parties also dispute the aspects of Ford's alleged conduct that ought to be scrutinized under the *Inkrott* standard. Ford reads the Complaint's bad faith allegation to be "Ford's efforts to drive Franklin Park out of the market and out of business constitute bad faith" (Doc. 109 at 5)

5

(quoting Doc. 31 at ¶ 73). Ford argues this Court and the Sixth Circuit already found there exist no genuine issues of material fact as to whether Ford schemed to drive Franklin Park out of the new-car sales market.

Franklin Park argues the issues previously decided in this case on summary judgment are narrower than Ford claims and "were made in a wholly different context" (Doc. 106 at 5), specifically, in passing on Franklin Park's now-dismissed OMVDA predatory-conduct claim. For purposes of opposing Ford's Motion, Franklin Park argues Ford failed to satisfy its OMVDA good-faith obligation not because it *approved* the Rouen-Brondes deal, but rather because (among other things) Ford "orchestrat[ed] and fund[ed] the transfer of Rouen Lincoln and Mercury franchises to Brondes" (*id*. at 14). *See also id*. at 16–22 (identifying disputed issues of fact). Franklin Park's focus is on Ford's role in the Rouen-Brondes deal, and on Ford's treatment of Franklin Park in connection with that deal.

This Court examines the summary-judgment record according to Franklin Park's broader view of the factual issues that could be disputed for purposes of this Motion, and considers the purportedly disputed issues of material fact to which Franklin Park points. *See Jim White Agency Co.*, 126 F.3d at 835 (framing the good-faith inquiry as deciding whether "[the manufacturer's] action in reaching [a] result were taken in good faith").

This Court will not, however, revisit its determination (and that of the Sixth Circuit) that Ford's 2008 view of the Toledo market as capable of supporting two Lincoln franchises -- not just one -- was supported by a commercial justification. Ford's two-franchise strategy cannot alone be used to create a triable issue with respect to Ford's good faith (*see* Doc. 98 at 14–15) ("As the district court recognized, Ford made a business decision in what it perceived to be in its own best interest. There is nothing in the record to indicate that it was anything more than that."). Again, "Defendant's

6

approval of the Rouen/Brondes transaction may not have been optimal -- indeed, it may even have been a bad decision -- but the Ohio statute does not prohibit bad decisions" (Doc. 88 at 10), only franchisor actions taken in bad faith.  There is no evidence to suggest that Ford's decision to retain two Toledo-area Lincoln dealers violates the OMVDA's good faith requirement.

**Ford's Role in Creating a "Need" for the Rouen-Brondes Deal**

Beginning its recital of the disputed issues of fact that preclude summary judgment, Franklin Park argues "Ford created a need for Rouen to sell the [Lincoln-Mercury] franchises" (Doc. 106 at 16). This fact is undisputed; after receiving an attractive offer for his purchase obligation (set to mature in 2011) on the facility that housed Rouen Lincoln Mercury, Rouen explored consolidating his existing Mitsubishi franchise with his existing Lincoln-Mercury franchise at a property adjacent to the Rouen Lincoln Mercury facility.  Because Ford denied the consolidation plan, and to avoid being left with a Lincoln-Mercury franchise but no acceptable facility at which to run the franchise, Rouen had no choice but to also sell the franchise (Doc. 82-4 at 25).

But Franklin Park has failed to raise a genuine issue as to Ford's good faith in denying Rouen's consolidation request (assuming Franklin Park can root a bad-faith claim in Ford's treatment of *another* dealer's request to restructure its operations).   Rouen explains Ford denied his consolidation request for two reasons. First, Ford prohibits competitive "dualing" (*i.e.*, using the same physical facility to sell new vehicles manufactured by a competitor of the Ford family of vehicles) (Doc. 85-3 at ¶ 15), and instead preferred that Lincoln dealerships be dualed with Ford dealerships in markets the size of the 2007 Toledo market (Doc. 82-4 at 33).  Second, as a matter of company policy at the time of the contemplated Mitsubishi-Lincoln consolidation, Ford permitted franchise relocation only if the franchisee proposed a facility that met (or with physical improvements would

7

meet) Ford's facility design standards. Rouen was unwilling to invest the funds necessary for the proposed Mitsubishi-Lincoln facility to meet Ford's facility design requirements (*id*. at 33–34) (explaining Ford "didn't feel that [the Mitsubishi] facility could get into the shape they needed for the half million dollar budget" Rouen proposed). Both bases for refusing consolidation constitute commercial justifications, and there are no other facts in the record that suggest Ford's decision to deny Rouen's consolidation request was taken on other grounds constituting bad faith.

### Ford's Financial Support of the Rouen-Brondes Deal

After creating the "need" for the Rouen-Brondes deal, Franklin Park argues "Ford then orchestrated the Rouen-Brondes transaction," in part by covering a portion of Philip Brondes' ("Brondes") purchase price, and by committing to extend funds to Brondes for facility improvements after the sale (Doc. 106 at 16). As it happened, Ford never actually paid Brondes any facility-improvement funds (Doc. 82-14 at 15), but Franklin Park nonetheless argues both forms of financial assistance were essential to sealing the Rouen-Brondes deal, and thus a triable issue exists with respect to Ford's good faith.

Applying the summary-judgment standard, this Court assumes a jury could find that Ford set in motion the Rouen-Brondes negotiations. Though Rouen could not recall precisely who "put [Rouen and Brondes] together" to explore the sale, and was "pretty sure" he (and not Ford) made the first call (Doc. 82-4 at 38), a jury could nonetheless credit the view that Ford matched up Rouen and Brondes as potential parties to a franchise transfer (despite testimony from all other deal participants -- Brondes, and Ken Brinkmann and Randy Stewart of Ford -- that Rouen first approached Brondes (*see* Doc. 82-14 at 6, 8; Doc. 85-9 at 7, 72; Doc. 82-10 at 12–13, 17)).

8

Even so, Franklin Park has failed to identify a triable issue with respect to Ford's good faith in "putting together" Brondes and Rouen. Under the Ford-Franklin Park Sales & Services Agreements ("SSA"), Ford reserved the right to determine "the numbers, locations[,] and sizes of authorized dealers" (Doc. 82-2 at 21). This reservation is far from "irrelevant" (Doc. 106 at 22). Franklin Park argues in the abstract that Ford cannot "reserve rights that are prohibited by the OMVDA" (*id*.), but never demonstrates why the exercise of this *specific* Ford reservation -- putting parties "together" or otherwise assisting in the sale of a franchise -- constitutes bad faith. *See Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 207 (6th Cir. 1995) ("The Agreement between Ford and Call clearly contemplated Ford's ability to contract with a successor franchisee under its own terms. Under Ohio law, Call cannot complain that Ford violated the duty of good faith simply because Ford exercised its clearly expressed contractual rights.").

Moving past Ford's alleged role as a "matchmaker" in the Rouen-Brondes deal, Franklin Park fails to show a reasonable jury could find Ford's role as partial financier of the Rouen-Brondes deal commercially unjustifiable. The undisputed record evidence shows Ford contributed $180,000 to Brondes' $700,000 purchase price (Doc. 82-14 at 8), and committed (but ultimately did not provide) $250,000 to cover improvements at a dualed Ford/Lincoln facility run by Brondes (*id*. at 15). Ford used financing of both types to encourage dualed company dealerships in up-to-date and aesthetically appropriate facilities. In Ford's judgment at the time of the Rouen-Brondes transaction, it was an effective market strategy to encourage upgraded, dualed facilities (Doc. 85-9 at 26). Financing of this type was a "standard program," not something cobbled together solely for the Rouen-Brondes deal (*id.* at 71). Franklin Park's observation that Ford was not obligated to finance any part of the deal is

9

beside the point; Ford opted to assist, points to record facts supporting that decision as commercially justifiable, and Franklin Park identifies no facts suggesting the contrary.

### Ford's Interaction with Franklin Park during Rouen-Brondes Deal Talks

Franklin Park identifies another disputed issue of fact in testimony that Ford "concealed its efforts [to "orchestrate" the deal], refusing to even confirm the parties were talking" (Doc. 106 at 16). Fleisher claims he got wind of the Rouen-Brondes negotiations in "late 2007/early 2008" and placed a call to Randy Stewart, then Ford's Detroit Regional Manager, to inquire further. "Mr. Stewart refused to talk to me about the rumors and would not confirm their truth" (Doc. 106-5 at ¶ 25). Franklin Park claims Stewart's refusal to confirm rumors of the deal was "dishonest," and therefore violated the OMVDA's good-faith requirement.

Franklin Park has not demonstrated that Ford lacked a commercial justification when it refused to confirm the existence of buy/sell talks to which Franklin Park was not a party. Correspondence exchanged between Fleisher and Stewart shows Stewart refusing to discuss rumors of a Rouen-Brondes deal because, if such talks existed, those talks would be private. *See* Doc. 82-1 at 195 (Stewart explaining in a January 16, 2008 email "I'm sure you can appreciate that for proprietary reasons, I'm not in a position to comment on market representation issues (whether factual or rumored) which do not directly involve Franklin Park"); *id*. at 202 (Stewart commenting in a February 12, 2008 email that with respect to a February 11, 2008 letter "advising [Franklin Park] of a potential transfer of ownership of the [Lincoln/Mercury franchise] in Maumee between Rouen [Lincoln/Mercury] and Brondes Ford . . . [t]here's not much else I can share with you beyond [the fact that the potential transfer would *not* add a third Lincoln/Mercury dealer in the area] as all other information between Rouen and Brondes is proprietary"). *See also* Doc. 82-10 at 17 (Stewart

10

deposition testimony explaining he did not confirm the existence of Rouen-Brondes negations to Fleisher because the negotiations were "private between two independent business people"). The record is devoid of any indication that Ford lied about the rumored deal's existence; Ford simply refused to broach the topic.

Franklin Park points to no basis in state statute, case law, or standards of commercial dealing in support of its claim that Ford failed to act in good-faith as to Franklin Park when it refused to discuss the Rouen-Brondes deal. On the contrary, the presumption for most parties to a business negotiation would be that third parties (especially third-party *competitors*) should not have a seat at the table. This Court doubts Franklin Park would appreciate it if Ford disclosed to third-parties the substance of sensitive, ongoing business negotiations to which Franklin Park is a party.

**Ford's Alleged "Structuring" of the Rouen-Brondes Deal to Evade State-law Notice and Protest Rights**

Franklin Park "believes Ford . . . structured the sale and relocation of the [Rouen] franchises to avoid a protest proceeding" (Doc. 106 at 17). Franklin Park provides no factual basis for this "belief" other than Fleisher's Second Affidavit, in which he recites the OMVDA notice and protest rights that may be triggered by a manufacturer's decision to install a new dealer near an existing dealer (Doc. 106-5 at ¶¶ 42–44). These statutory provisions "cause [Fleisher] to believe that Ford wanted to combine the Rouen Lincoln and Mercury franchises with Brondes Ford Maumee, but Ford knew if it did so, Franklin Park would protest" and Ford would lose that protest (*id.* at ¶ 45). So, Fleisher believes Ford "intentionally structured the Rouen-Brondes transaction and . . . relocation" to avoid the state-law notice and protest regime (*id.* at ¶ 46).

Franklin Park is barred from re-litigating whether the terms of the completed Rouen-Brondes transaction triggered the OMVDA's notice and protest provisions -- a state agency and two state

11

courts determined it did not (*see* Doc. 28 at 8–9). However, collateral estoppel does not bar Franklin Park from arguing Ford acted in bad faith by "structuring" the deal to fit the OMVDA's exceptions; it simply has provided no record support for that view of Ford's conduct.

Franklin Park appears to argue Ford's bad-faith "structuring" is a result of the fact that Brondes only briefly conducted business at the former Rouen Conant Street facility before moving to the Brondes Ford South Reynolds location. Here is what record facts disclose about that arrangement: Rouen allowed Broneds to operate out of the Brondes Conant Street facility "for long as [Brondes] need[ed] to do business out of [the Rouen] building" (Doc. 82-14 at 11). That transition period ultimately lasted three or four days (*id*. at 22–23), and the parties to the deal explain the transition period was intended to allow Brondes time to get necessary approvals from Ford (to become a Lincoln/Mercury dealer) and the State of Ohio (to relocate the transferred franchise to the current South Reynolds location) (*id*. at 7). *See also* Doc. 82-4 at 58 (Rouen explaining the transition period as allowing Brondes to "get his act together"); Doc. 82-5 at 71; Doc. 85-9 at 131–32.

On February 7, 2008, Ford and Rouen entered into a Letter of Understanding ("LOU") (Doc. 82-5 at 71–72). The LOU "confirm[ed Ford and Rouen's] understanding and agreement regarding the sale of [Rouen's] Lincoln Mercury Facility and the sale of [Rouen's] Lincoln Mercury franchise" (*id*. at 71). Ford had site control of Rouen's Conant Street facility, but agreed to release that control, "allow[ing Rouen] to close on the sale of [the facility] to Gold's Gym" (*id*.) In exchange, Rouen agreed to (among other things) "[a]llow Brondes Lincoln Mercury, Maumee to operate at [Rouen's] present location for a period of 1 (One) day. This will allow Brondes to relocate the Lincoln Mercury franchise to his Ford dealership in Maumee, and be in compliance with Ohio law" (*id*.).

12

A jury could discount Rouen and Brondes' explanation of the genesis and purpose of the transition period, and instead conclude that Ford imposed on Rouen, through the LOU, the obligation to permit Brondes a one-day layover. There is no direct evidence suggesting the Ford-imposed, one-day layover requirement was designed to avoid triggering the state-law notice requirements, but a jury could infer that fact from circumstantial evidence.

Specifically, § 4517.50(A) provides that "when a franchisor seeks to enter into a franchise to establish an additional new motor vehicle dealer in, or relocate an existing new motor vehicle dealer" within a 10-mile radius of an existing "same line-maker of motor vehicle" franchisee, the franchisor "shall first give notice" to the existing same-line franchisee and to the Motor Vehicle Dealer Board. The franchisor may not "establish an additional new motor vehicle dealer or relocate an existing new motor vehicle dealer" without such advance notice. R.C. § 4517.50(B). But the advance-notice requirement does *not* apply in the following instances:

> (1) The relocation of an existing new motor vehicle dealer within one mile from the existing location;
>
> (2) The sale or transfer of an existing new motor vehicle dealer where the transferee proposes to engage in business at the same location;
>
> (3) The relocation of an existing new motor vehicle dealer that relocates further from an existing line-make new motor vehicle dealer although the relocation is within the same line-make new motor vehicle dealer's relevant market area.

R.C. § 4517.50(C).

Again, proceedings before the relevant state agency and state courts determined the Rouen-Brondes deal did not trigger the § 4517.50 notice and § 4517.57 protest provisions because the Rouen-Brondes transaction involved an existing franchise transferred within one mile of the Rouen facility.

13

Even though presented with Franklin Park's bad-faith subtext for the Rouen-Brondes sale-layover-relocation deal structure, the Ohio court of appeals specifically held:

> Indeed, Ford's [February 7, 2008] letter [informing Franklin Park of the proposed Rouen-Brondes sale] did not fully communicate what was occurring [*i.e.*, it omitted reference to the one-day layover, memorialized on the same day in the Ford-Rouen LOU]. However, the statute does not guard against such conduct. The statute is clear and unambiguous. The legislature intended to exempt certain kinds of transfers and relocations from the notice requirement in R.C. [§] 4517.50(A), including relocations of less than one mile, and transfers where the transferee *proposes* to engage business at the existing location. The statute does not place a requirement on the length of time that a transferee conducts business at the existing location.
>
> To adopt appellants' interpretation of R.C. [§] 4517.50, we would have to superimpose a tacit, good-faith requirement therein. We would also have to add a time requirement for engaging in business, after the legislature chose not to do so. Although this might seem like a reasonable action for a court to take, given the specificity with which the legislature created the two exemptions in section (C), this court would be legislating from the bench, were we to superimpose a time requirement for operating a business into the statute. We chose not to do so generally, and specifically in this case.

*Fleisher v. Ford Motor Co.*, 2009 WL 2374554, at \*4 (Ohio Ct. App. 2009) (emphasis in original). In short, a state court, addressing this very dispute, already has decided that a one-day layover deal structure does not trigger Ohio's dealer notice and protest provisions. Franklin Park therefore seeks to create a triable issue as to Ford's good faith (again, assuming Ford designed the one-day layover structure) because Ford drafted deal terms that are permissible under state law. Phrased differently, Franklin Park seeks to reach the jury on the following theory: A jury could find Ford liable under the OMVDA's good-faith requirement because Ford drafted a contract with the purpose of avoiding a (possibly) costly state protest proceeding. But business entities routinely draft contracts to avoid costly legal proceedings by (for example) including in a contract arbitration clause or prospective waivers of legal liability.

14

Franklin Park's purported case law support illustrates what is missing from this case in the way of evidence of bad-faith "structuring." In *Mercure v. General Motors Corp.*, 4:02CV2124, Doc. 25, at *3–4 (N.D. Ohio 2003), General Motors ("GM") approved the transfer of an existing GM light truck franchise, but *denied* the buyer's request to transfer that franchise to a location at which the buyer sold other vehicles. GM argued only the grant of a relocation request triggered OMVDA protest rights. Still, the manner in which GM structured its decision could support a good-faith claim because "by separating the sale and relocation decisions, [GM] constructively den[ied] the buy/sell agreement." *Id.* at *12. No comparable indications of Ford's bad-faith exist here. Franklin Park provides no basis in Ohio law or standards of commercial dealing for the proposition that when a franchisor makes a business decision that (1) avoids litigation expenses and (2) is permissible under state law, the franchisor nonetheless acts in bad faith. Franklin Park cannot reach a jury on its one-day layover "structuring" theory.

**Fleisher & Matthews' "Second Affidavits"**

Finally, Franklin Park attaches to its Opposition "Second Affidavits" of Fleisher, Franklin Park's president, and Matthews, Franklin Park's expert witness, "in which both [individuals] conclude, and explain why, Ford's conduct was commercially unjustifiable" (Doc. 106 at 18). Matthews' Second Affidavit is, in large part, identical to his "First Affidavit" (*compare* Doc. 106-7 at ¶¶ 1–5(a)–(e), 6–8, *with* Doc. 85–5 at ¶¶ 1–8). Moreover, based on a review of the Second Affidavits' footnote citations, each Second Affidavit relies entirely on evidence submitted as part of the initial summary-judgment motion. Neither creates factual disputes that preclude summary judgment.

As for Fleisher, his Second Affidavit chronicles: Franklin Park's structure and history as a Ford franchisee, as well as Toledo-area market characteristics (Doc. 106-5 at ¶¶ 3–15, 20, 29–30, 37); the decline in the Lincoln brand (*id*. at ¶¶ 16–17, 31–36, 38); changes in Ford representation strategy (*id*. at ¶¶ 18–19); Fleisher's efforts to convince Ford that Toledo should become a "one-dealer" town (*id*. at ¶¶ 22–24); details about the Rouen-Brondes deal, and Franklin Park's opposition to the then-rumored deal (*id*. at ¶¶ 25–28); Franklin Park's claimed damages (*id.* at ¶ 41); and Fleisher's "beliefs" about Ford's intentional efforts to avoid protest proceedings under R.C. § 4517.57 (*id*. at ¶¶ 42–46). Fleisher combines these various declarations and opines that "it was commercially unjustifiable for Ford to (1) approve the buy-sell and relocation agreement from Rouen to Brondes in the Toledo, Ohio market and (2) subsidize the proposed transaction with $180,000 in cash and [an] agreement to further provide another $250,000 for future [Brondes] facility improvements" (*id*. at ¶ 40).

In light of the prior determinations in this case and the nature of the record facts, Fleisher's Second Affidavit -- in part a summary of existing evidence (*e.g.*, Fleisher's description of his January - February 2008 email exchanges with Stewart), and in part a recital of unsupported "beliefs (*e.g.*, Fleisher's view on Ford's "structuring" of the one-day layover) -- does nothing to present a jury question on Franklin Park's good-faith claim.

Matthews' Second Affidavit is similar. He too summarizes evidence in the record on the same topics discussed by Fleisher in his Second Affidavit (Doc. 106-7 at ¶ 9). He likewise reviewed the decline in the Lincoln brand prior to and following the Rouen-Brondes transaction (*id*. at ¶ 10). Based on these facts and Matthews' "experience in the new motor vehicle industry" Matthews declares (*id.* at ¶¶ 11–12) (paragraph break omitted):

16

> [I]t was NOT commercially reasonable NOR justifiable for Ford to (1) approve and (2) financially participate [in] and subsidize the Brondes purchase and relocation of the Lincoln and Mercury franchises from Rouen in the Toledo, Ohio market in 2008. It is my opinion that it was NOT commercially reasonable NOR justifiable that Ford's Toledo, Ohio dealership network (comprised of privately owned and independent franchisees of the same-line Lincoln and Mercury dealers) was altered by Ford's financial participation in the Rouen/Brondes buy/sell and relocation proposal, which disrupted the free-market economic system.

Matthews' opinions are conclusory and, at most, undermine the business sense of Ford's decisions; they fail to create a factual dispute on the commercial justification for Ford's role in the Rouen-Brondes deal.

## CONCLUSION

Construing record facts in Franklin Park's favor, reasonable minds could only conclude that Ford had a commercial justification for the actions it took. Ford is entitled to judgment as a matter of law with respect to Franklin Park's good-faith claim. Ford's Motion for Summary Judgment is granted.

Franklin Park's President promised to be "relentless" in this dispute with Ford. And so he has. Fleisher's commitment to his "livelihood" and his employees is admirable. Perhaps, after years of battle in Ohio agency and judicial forums and in federal district and appellate courts, this litigation has run its course.

IT IS SO ORDERED

                                              s/ *Jack Zouhary*
                                              JACK ZOUHARY
                                              U. S. DISTRICT JUDGE

                                              May 16, 2014